UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES H. LANG,

        Plaintiff,

v.                                            Case No. 11-C-0188

PROGRESSIVE EXPRESS INSURANCE
COMPANY,

        Defendant.

**ORDER DENYING MOTION IN LIMINE**

        This cases arises out of a claim made by Plaintiff James H. Lang on an insurance policy issued by Defendant Progressive Express Insurance Company (Progressive). Specifically, Progressive insured Lang's boat but denied coverage for damage to the boat motors, asserting the damage was excluded under the policy. Lang brought suit against Progressive asserting two causes of action: (1) breach of contract and (2) bad faith. Presently before the Court is Defendant's motion in limine seeking exclusion of Plaintiff's expert testimony from Matco Services Inc. (Matco). (ECF No. 23). For the reasons stated herein, Defendant's motion will be denied.

**I. Background**

        Most of the facts of this case are not in dispute. Progressive insured Lang's boat, a 1991 Fountain 31-foot power boat, including its outboard motors. Lang utilized the boat (located at all times relevant to this proceeding in Naples, Florida) June 3–10, 2010. Lang inspected the motors

during that time and noticed no damage. Lang's son Nicholas used the boat June 23–27, 2010. He also inspected the outboards and noticed no damage.

Lang engaged Gulfshore Hull and Prop (Gulfshore) to inspect and clean the boat on a monthly basis. Gulfshore's divers did this by inspectingy the underside of the boat each month, including an examination of the zinc metal attached to the motors. The zinc attachments are intended to attract stray electrical voltage (thereby diverting such voltage from the main motor components). Following the monthly inspections, Gulfshore issued a bill that set forth the results of its inspections.

Gulfshore's June 2010 inspection revealed no motor damage. However, on July 9, 2010, Gulfshore performed its monthly cleaning and inspection dive and reported "the outboards are showing signs of electrolysis and they need to be completely out of the water." Shortly thereafter, the boat was removed from the water by The Boat Place of Naples, Inc. The motors were deemed totaled and have since been replaced.

Lang made a claim under the Progressive policy for the damage to the boat motors. Progressive denied the claim, saying coverage was excluded under Part IV of the policy. Part IV reads in relevant part:

> Coverage under this part IV does not apply to any loss:
> 9. Caused directly or indirectly by:
> C. Gradual Deterioration of any kind including, but not limited to weathering, rust, corrosion . . .
> E. Mechanical, Electrical or Structural Breakdown, except for subsequent loss by fire or explosion.

(ECF No. 25 Ex. A.) According to Progressive, Lang's claim is excluded because it fulls under gradual deterioration. Lang brought this suit in response.

**II. The Expert Testimony**

Lang hired an expert, Matco, to assist in his case. Two Matco employees worked on the file: Kevin Groll, a licensed corrosion engineer and material failure analyst, and Dr. Mehrooz Zamanzadeh, a material specialist. Dr. Zamanzadeh has a Ph.D. in material science from Pennsylvania State University and has over twenty five years of practical experience in the fields of failure analyses and material coating.

Following its engagement, Matco took possession of the motors and issued a preliminary report on July 7, 2011. The report concluded "the damage exhibited on the two Suzuki outboard engines was the cause of stray currents and not the cause of general galvanic corrosion because of the characteristics of the damage and the corrosion of the dissimilar metals." The report also opined that "[t]he fact that the copper bolts are damaged indicates the probability that an additional source (stray current) influenced the accelerated damage."

Groll and Dr. Zamanzadeh also testified at depositions conducted by Progressive on September 15, 2011. They testified Matco performed visual examination and dimension testing. They said this sort of testing was all that was required to identify, with reasonable certainty, the cause of the motor damage. They further opined the damage sustained by the motors was not gradual but rather the result of dynamic and aggressive "stray current" (defined as man-made electrical current not present constantly but present sporadically). Groll and Dr. Zamanzadeh also testified that in reaching their conclusions they relied on established authorities in the field, including Uhlrig's Corrosion Handbook, Corrosion and Corrosion Control, and the ASM Metals Handbook.

Groll and Dr. Zamanzadeh testified that Uhlig's Corrosion Handbook provides the support for their opinion that the corrosion in question was well beyond that which could be deemed to be gradual or natural corrosion in a saltwater environment. They opined that the dimensional testing conducted by Matco revealed corrosion penetrations of 0.375 inches, compared with a natural corrosion rate in saltwater of less than 0.001 inches per year. In other words, the corrosion rate to the Lang motors was far more than 1,000 times greater than the annual rate of corrosion to aluminum in saltwater. The visual testing revealed that the copper components of the motors were corroded.

Groll and Dr. Zamanzadeh also opined that given the "aggressive" corrosion evidenced on the motors, it was likely the stray voltage was DC, not AC, which corrodes aluminum at a significantly lesser rate. They noted the presence of corrosion on the copper bolts on the Lang motors. Since copper corrodes as a result of DC stray voltage, but generally not because of AC stray voltage, they felt that this fact provided additional support for their opinions. Nonetheless, neither Groll nor Dr. Zamanzadeh could identify the source of the stray voltage.

**III. Standard of Law**

Whether or not the opinion of an expert is admissible is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto, in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

4

The party who proffers an expert's testimony bears the burden of establishing its admissibility under Rule 702. *Lewis v. CITGP Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009); *Fail Safe, LLC v. A.O. Smith Corp.*, 2010 WL 5495017 at * 12 (E.D.Wis. 2010). The report of the expert — required by Fed. R. Civ. P. 26(a)(2)(B) — must be sufficiently thorough and complete to show the expert satisfies the requirements of Rule 702. *Salgado v. General Motors Corp.*, 150 F.3d 735, 742, n. 6 (7th Cir. 1998).

In order for an expert's testimony to be admissible under Rule 702, the expert must have sufficient training, knowledge, skill, or experience so as to qualify him or her to give the proffered opinions. *O'Connor v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105–07 (7th Cir. 1994). Additionally, the Court, acting as "gatekeeper" must determine that the proposed testimony meets the reliability requirements set out by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (now codified in Rule 702). Under the *Daubert* framework, the court must determine whether the proffered expert testimony is both relevant and reliable. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). This is a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592–93; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702. In determining reliability, *Daubert* also sets forth the following non-exhaustive list of guideposts: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94. Plaintiff objects to Matco's testimony under two

5

theories. First, Plaintiff contends the Matco testimony is unhelpful. Second, Plaintiff contends Matco's testimony should be excluded because it is unreliable. Each theory will be discussed in turn below.

**IV. Discussion**

As mentioned above, Rule 702 "implicitly contains the proposition that expert testimony which is based on unreliable methodology is unhelpful and therefore excludible." *See* 29A Am. Jur. 2d Evidence § 1014, Reliability of Scientific Technique Used by Expert Witnesses (2012). Plaintiff contends Matco's opinion is not helpful in that it fails to address the key issue: whether the corrosion damage was sudden and caused by stray electric current. But that is not true.

Matco opines that stray current is the cause of the corrosion, but is unable to identify the source of the stray current or the circuit connecting the source to the Plaintiff's boat. The failure to identify the source of the current is not fatal to the admissibility of the experts' testimony as to the cause of the corrosion. The opinions of these experts as to cause will still assist the trier of fact in determining whether the damage was natural and gradual or unnatural and sudden. "Stray current" is not within the understanding of the average person; there are complicated matters regarding "stray current" that only a trained professional can explain. (ECF No. 32 at 8.) The average juror will not know that one can determine the cause of corrosion from examining the depth and character of the pitting. If this testimony has the support in the literature that Dr. Zamanzadeh indicated, which the defendant does not dispute, then it is admissible under Rule 702. Thus, even though the experts are unable to determine the source of the stray current, they can offer their opinions that the corrosion was accelerated by such current. The record apparently contains

other evidence, i.e., third-party inspection reports and observations of owner, that bear on the period of time over which the corrosion occurred. The Matco testimony is accordingly helpful to the trier of fact and will not be excluded on those grounds.

Plaintiff alternatively argues Matco's opinion fails to meet the second prong of Rule 702 because it is unreliable. The Seventh Circuit has recognized that a failure to test may render an opinion unreliable and inadmissible. *See Chapman v. Maytag Corp.*, 297 F.2d 682, 688 (7th Cir. 2002). To satisfy Rule 702, a "very significant *Daubert* factor is whether the proffered scientific theory has been subjected to the scientific method." *Chapman*, 297 F.2d at 688. This does not require that every expert opinion to be specifically supported by empirical testing. If, as the evidence her suggests, the opinion is based on principles that are set forth in authoritative works that have been subjected to empirical testing, the expert may apply those principles without repeating the empirical testing on which they are based. Here, Plaintiff's experts testified that they performed a visual examination and dimensional measuring of the motors. Defendant offers no evidence suggesting that a more refined examination or specific testing is required to support the opinions offered. According to Plaintiff's experts, these examinations were not only appropriate in their field, but are encouraged in ASM Metals Handbook. (Groll Aff. ¶¶ 6–9 and Zamanzadeh Aff. ¶¶ 6–9.) This is wholly consistent with Mr. Groll's testimony that, in cases such as this, one knowledgeable in the field can look at the damaged component and identify the problem even where the cause is unknown. (ECF No. 25, Ex. C at 32, ll. 6–25 and 33, ll. 1–7.) Though other tests may be available, they may be prohibitively expensive (as Plaintiff suggests) or redundant in light of what can be determined through a visual examination.

The Court should not overlook nor ignore wholly appropriate and sufficient examinations. Further, as mentioned above, *Daubert* does not impose affirmative testing requirements on a litigant; it requires only that the opinions of an expert be capable of being tested. In other words, testing is a factor to be considered under a Daubert analysis, but its absence alone is not fatal to an expert's testimony. Testimony that has weaknesses or flaws is not automatically excluded under *Daubert* but instead is exactly the sort of topic to be analyzed during cross-examination. Here, should Progressive wish to challenge Matco's conclusions, they have been provided the tests to mount that attack. The Matco testimony is therefore not unreliable under *Daubert* and will not be excluded on these grounds, either.

**V. Conclusion**

In sum, Matco's expert testimony is neither unreliable nor unhelpful. Progressive's motion in limine (ECF No. 23) is accordingly DENIED.

Dated this ___19th___ day of April, 2012.

                                            s/ William C. Griesbach
                                            William C. Griesbach
                                            United States District Judge